FILED
United States Court of Appeals
Tenth Circuit

July 31, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HASAN ALI HASAN,

Defendant-Appellant.

No. 11-5065

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:05-CR-00174-JHP-1)**

---

Barry L. Derryberry, Research and Writing Specialist (Julia L. O'Connell, Federal Public Defender, with him on the brief) Office of the Federal Public Defender, Tulsa, Oklahoma, for Appellant.

Leena Alam, Assistant United States Attorney (Thomas Scott Woodward, United States Attorney, Northern District of Oklahoma, with her on the brief) Office of the United States Attorney, Tulsa, Oklahoma, for Appellee.

---

Before **TYMKOVICH**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This case requires us to consider whether the district court applied the correct legal standard in evaluating whether Hasan Ali Hasan was entitled to a court interpreter at grand jury proceedings that led to his indictment for perjury.

We have reviewed the proceedings below twice before. In 2005, Hasan was convicted after a jury trial on three counts of perjury before a grand jury in violation of 18 U.S.C. § 1623. The conviction was appealed and remanded because we concluded that Hasan may not have been able to communicate effectively in English in violation of the Court Interpreters Act, 28 U.S.C. § 1827. We remanded to the district court so the court could make findings related to Hasan's comparative ability to understand the grand jury proceedings. *United States v. Hasan*, 526 F.3d 653 (10th Cir. 2008) (*Hasan I*). After remand, Hasan again appealed, this time arguing the court had not adequately followed our directions spelled out in *Hasan I*. We agreed, leading to a second remand for more specific findings. *United States v. Hasan*, 609 F.3d 1121 (10th Cir. 2010) (*Hasan II*).

The district court then entered additional findings and conclusions, based on its review of the grand jury transcripts and its observations of the trial proceedings, that Hasan could sufficiently comprehend and communicate in English at the grand jury proceedings, and that whatever linguistic limitations he had were not so great as to make the proceedings fundamentally unfair. The

question presented in this appeal is whether the district court's findings and conclusions satisfy our directions in *Hasan I* and *Hasan II*.

We conclude the district court did. Accordingly, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

# I. Background

The underlying facts of this case were presented in *Hasan I* and *Hasan II*, so we will only briefly review them here.

In 1997, 17-year-old Hasan entered the United States seeking refuge from the Somalian civil war. Citing persecution suffered personally and by his family, Hasan sought and was granted asylum that same year. During government interviews that took place during the asylum process, Hasan gave conflicting testimony regarding the persecution that his family had experienced; specifically the level of persecution, the timeline of key events, and the harm to family members differed in several iterations. *Hasan I* noted that "[i]t is undisputed that Mr. Hasan is a native Somali speaker and, at the time he entered this country, communicated with government officials exclusively through an interpreter." 526 F.3d at 656.

In the years following his grant of asylum, Hasan found a job as a security guard in Virginia, then moved to Oklahoma, became a bus driver for the Tulsa Public Schools, obtained a commercial driver's license (after passing a test written in English), and married an American woman who spoke no Somali, after

initially corresponding with her over the Internet. Hasan also completed five semesters of English as a Second Language courses, and admits that he did well in the courses.

In 2004, a special agent with the Department of Homeland Security reviewed Hasan's file at the request of the FBI, noting the inconsistencies in his statements from 1997. The agent interviewed Hasan, questioning him (in English) regarding inconsistent statements that he made when he entered the United States and when he sought asylum.

In April and November 2005, Hasan was twice called to testify before a federal grand jury. The grand jury was charged with investigating possible false statements made by Hasan during his 2004 interview with the agent, in violation of 18 U.S.C. § 1001. During his grand jury testimony, Hasan was neither represented by counsel nor did he have an interpreter available to assist him; but he requested neither. In addition, he was advised in English of his rights on both occasions, and when asked by the government if he understood what he had been advised, he unequivocally responded "yes." R., Vol. I at 229–30. At several points during his testimony he appears to have had trouble responding to the questions, despite his representation prior to the proceedings that he understood English. Hasan also specifically waived the use of an interpreter in a meeting with a probation officer shortly after the grand jury proceedings. The grand jury proceedings are described in greater detail in *Hasan I* (and its Appendix A).

In December 2005, despite initially being investigated for his statements at the time he sought asylum, Hasan was indicted for perjury for discrepancies during his grand jury testimony, pursuant to 18 U.S.C. § 1623. The four counts pertained to: (1) conflicting statements regarding which of Hasan's brothers had been shot and killed; (2) false statements regarding violence directed against his sister; (3) inconsistent statements about a beating that Hasan received; and (4) inconsistent statements regarding Hasan's family name.

### A. Pre-Trial Motions

Prior to the perjury trial, Hasan moved to suppress his grand jury testimony because he had been "only 'summarily advised of his Fifth Amendment rights' to remain silent and to due process, and that he could not have validly waived these rights given his limited understanding of English." *Hasan I*, 526 F.3d at 658. He also filed a separate motion asking the court to appoint an interpreter during trial, pursuant to the Court Interpreters Act (CIA). *See* 28 U.S.C. § 1827. The CIA requires a "presiding judicial officer" to "utilize the services of the most available certified interpreter" if "a witness who may present testimony in . . . judicial proceedings . . . speaks only or primarily a language other than the English language . . . ." *Id.* at § 1827(d)(1).

An evidentiary hearing was held and Hasan presented the testimony of Dr. Gene Halleck, an applied linguist at Oklahoma State University. Based on Dr. Halleck's interview with Hasan, Dr. Halleck concluded that Hasan had an

"intermediate mid-level comprehension" of English that his comprehension of English was not sufficient to proceed to trial without an interpreter. R., Vol. II at 109. But Dr. Halleck later revised that testimony and said Hasan was borderline between "novice and intermediate." *Id.* at 143. Dr. Halleck admitted that the test administered to Hasan was not normally used in this way (attempting to show deficiencies rather than being used to try to get as good of a score as possible), and that the test had no scale to determine if the test taker was refusing his best efforts.

The district court initially denied Hasan's request for an interpreter, finding that he did not meet the statutory requirement that he "speak only or primarily a language other than English." R., Vol. I at 70. "It is entirely possible that Mr. Hasan's proficiency in Somali[] is as low as his proficiency in English, especially in light of the fact he has not been in Somalia for approximately nine years." *Id.* The district court denied Hasan's motion to reconsider its denial of an interpreter, noting:

> [T]he fact that the defendant gave appropriate responses
> to questions posed in English during the grand jury;
> acknowledged he could communicate in English and
> specifically waived the services of an interpreter when
> interviewed by the probation officer; has worked in
> occupations which required that he be able to speak
> English; and has taken complex written tests which were
> given in English.

*Id.* at 74.

At the same time, the district court denied Hasan's motion to suppress the grand jury transcripts, finding that (1) he received "more than sufficient" warnings about his rights, responsibilities, and the consequences of perjury; (2) he never requested an interpreter; and (3) the totality of the transcripts of both proceedings revealed that Hasan understood what was being asked "and/or asked for clarification if he felt it was needed." *Id.* at 72–73.

Just prior to trial and *sua sponte*, the court reconsidered the issue of an interpreter and permitted one be assigned because "defense counsel, as an officer of the court, ha[d] indicated he [was] having difficulty communicating with his client." *Id.* at 114.

Ultimately, after a trial where one of Hasan's defense theories was his inability to understand and articulate responses in English during the grand jury proceedings, the jury convicted Hasan on three of the four counts. He was sentenced to 15 months imprisonment for each count, with three years of supervised release.[1]

---

[1] Our review of the record indicates that Hasan has finished serving his sentence—including a period of supervised release. But it is well settled that, even if a sentence has been completed (including the terms of supervised release), the direct appeal is not moot as long as sufficient collateral consequences continue to flow from the underlying conviction. *Sibron v. New York*, 392 U.S. 40, 55–56 (1968). "[T]he obvious fact of life [is] that most criminal convictions do in fact entail adverse collateral legal consequences. The mere possibility that this will be the case is enough to preserve a criminal case from ending ignominiously in the limbo of mootness." *United States v. Hahn*, 359 F.3d 1315, 1323 (10th Cir. 2004) (quoting *Sibron*, 392 U.S. at 55).

### B. *Hasan I*

On his direct appeal, Hasan argued that the failure to provide him with an interpreter before the grand jury violated the CIA. We remanded the case for the district court to consider whether the findings and conclusions that led the court to appoint an interpreter at trial also applied to Hasan's grand jury appearances. *Hasan I*, 526 F.3d at 667.

Specifically, the court directed the district court to determine "whether, at the time of the grand jury hearings, Mr. Hasan spoke 'only or primarily a language other than the English language.'" 526 F.3d at 666 (quoting 28 U.S.C. § 1827(d)(1)(A)). Second, if Hasan's language was other than English, the district court was to determine whether the lack of an interpreter inhibited his comprehension or communication "to such an extent as to have made the [grand jury hearings] fundamentally unfair." *Id.*

### C. *Hasan II*

On remand, the district court found that Hasan spoke primarily English and that his comprehension or communication had not been inhibited such that the lack of an interpreter during his grand jury appearances deprived him of fundamental fairness. Specifically, the district court said that "the evidence was uncontroverted that the Defendant communicated with 1) his employers, 2) students on his bus routes and 3) his wife, in English." *Id.*, 609 F.3d at 1128 (quoting district court's order).

-8-

But on appeal we concluded the findings were insufficient under the legal standard established in *Hasan I*. We again remanded, holding that the district court failed to weigh indicators of Hasan's ability to speak English "against contrary indicators of his Somali-language ability" in determining whether Hasan spoke only or primarily a language other than English. *Hasan II*, 609 F.3d at 1129. "There is no doubt that Mr. Hasan used English in some circumstances . . . . [b]ut under the proper legal standard, such a fact does not necessarily entail a finding that his primary language was English . . . . This is precisely why we insisted on a comparative standard in the first place, and why it is crucial for the district court to analyze Mr. Hasan's language abilities under this standard." *Id.* We directed the court to answer this question, and if English was not Hasan's primary language, to then resolve whether he could adequately understand and communicate sufficiently to make the proceedings fundamentally fair.

### D. Second Remand

On the second remand, the district court concluded that the current record provided no basis for it to determine whether Hasan was fluent in Somali at the time of his grand jury testimony, but that in any event, he was "clearly capable of communicating in English at the time of the grand jury proceedings." R., Vol. I at 389. As a result, the court found that "the lack of an interpreter during the grand jury did not inhibit Mr. Hasan's comprehension of the grand jury

proceedings . . . to such an extent as to have made the grand jury proceedings fundamentally unfair." *Id.* at 390.

This conclusion is now before us.

## II. Discussion

We review a trial court's decision to appoint an interpreter for an abuse of discretion. *Hasan II*, 609 F.3d at 1127. "This rule is appropriate because the trial judge is in the best position to assess a defendant's or witness' language usage, comfort level and intelligibility." *Id.* Under this standard, we review factual determinations for clear error, and underlying legal determinations de novo.

On appeal, Hasan raises three issues: (1) whether the district court erred by not properly considering the correct two-step legal framework—the "order of battle"—laid out in *Hasan I* and *II*; (2) whether the district court applied the proper legal standards to the second step of the analysis; and finally (3) whether the district court's conclusion on the merits was proper.

We find no clear error in the district court's findings of fact and application of the law, and so we affirm.

### A. "Order of Battle"

In *Hasan II*, we asked the district court to determine: (1) whether, at the time of the grand jury hearings, Mr. Hasan spoke only or primarily a language other than the English language; and (2) if Hasan's language was other than English, to determine whether the lack of an interpreter inhibited his

-10-

comprehension or communication to such an extent as to have made the grand jury hearings fundamentally unfair. 609 F.3d at 1129. While the remand directed a sequential approach, the opinion itself did not explicitly require a specific "order of battle" in resolving the questions on remand.

More specifically, we gave the following two-step directions:

> [Step One] First the district court should follow the blueprint laid out in *Hasan I* and undertake a comparative analysis to identify Mr. Hasan's primary language at the time of the grand jury proceedings.

*Id.* at 1131. Then, if this review leads to a conclusion Hasan spoke primarily English, the court's analysis would end, since he would not be entitled to relief under the CIA. The court would move to step two if Hasan's primary language was other than English:

> [Step Two] If the district court concludes that Mr. Hasan spoke primarily Somali, then it should proceed to the next step and determine whether, in light of this determination, Mr. Hasan was *inhibited in his ability to comprehend and communicate at the grand jury proceedings to such an extent as to have been fundamentally unfair*.

*Id.* (emphasis added).

Hasan argues that this directive was never followed because the district court failed to either (1) draw a conclusion at all under the first step, or (2) assume *arguendo* that Hasan did not primarily speak English at step one before moving on to the second step of the analysis.

-11-

We disagree with this interpretation of the district court's order. In its order, the court summarized its review of the entire record before concluding that "no evidence was ever presented to establish that Mr. Hasan was *proficient* in any language." R., Vol. I at 388 (emphasis in original). The court continued: "since this Court has no way of knowing from the record if the Defendant was actually fluent in Somali[], or Arabic for that matter, this Court cannot say, at the time of the grand jury, that the Defendant's 'comparative ability' to speak Somali was or was not better than his ability to speak English." *Id.* at 389.[2] But "based upon the entire record in this case, [] the Defendant was clearly capable of communicating in English at the time of the grand jury proceedings." *Id.*

Based exclusively on the text of the district court's opinion, it appears Hasan is correct that the district court failed to either (1) answer definitively the first step of the inquiry, or (2) explicitly assume an appropriate answer before proceeding to the fundamental fairness inquiry. But, as the government argues, "merely by moving onto the second step at all, the district court implicitly accepted that the first step had been met." Aple. Br. at 25. The government

---

[2] We concluded in *Hasan I* that "Mr. Hasan is a native Somali speaker and, at the time he entered the country, communicated with governmental officials exclusively through an interpreter." 526 F.3d at 656. Accordingly, we construe the district court's finding narrowly—meaning it is possible that, *at the time of the grand jury inquiry*, Hasan had lost his fluency in his native tongue since the district court was unable to assess his comparative ability. But nonetheless, this finding by the district court is not essential to our holding since we find the second step of the test to be dispositive.

further notes that, in this appeal, Hasan "merely challenges the district court's failure to state that it was assuming that the first step was met before moving on to the second step . . . . the only question before the Court is whether the district court in fact assumed arguendo that Hasan spoke primarily Somali in proceeding to the second step of the CIA analysis." *Id.* at 26.

There was no error in the district court's determination. No talismanic quality attaches to a rigid order of battle. By moving on to the second step, the district court was clearly signaling that it concluded either Hasan spoke a primary language other than English or assumed he did. This is easily seen by considering the *Hasan II* directive that: "[i]f the court concludes that Mr. Hasan spoke primarily English, its analysis should come to an end." 609 F.3d at 1131. Since the court moved on to the next step, we can only conclude the court found that Hasan did not primarily speak English, or at least assumed that he did not for purposes of analysis. *See also Hasan I*, 526 F.3d at 666 (describing the two-step inquiry and concluding that "of course either [step] may be dispositive if not resolved in Mr. Hasan's favor").

Furthermore, there is no reason the district court must use specific language to signal its transition to the next step. In the qualified immunity context, for example, the Supreme Court has "retired [the] 'rigid order of battle' approach, instead affording appellate courts discretion to decide 'which of the two prongs of the . . . analysis should be addressed first in light of the circumstances in the

-13-

particular case at hand.'" *Riggins v. Goodman*, 572 F.3d 1101, 1107–08 (10th

Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 234–36 (2009)); *see also*

*Strickland v. Washington*, 466 U.S. 668, 685–86 (1984) (allowing ineffective

assistance of counsel challenges to be disposed of based on either prong of a two-

prong test). We see no reason why a different approach should be required in this

context.

Accordingly, while it would have been helpful for the district court to

explicitly denote that it was moving past step one—specifically in light of the

multiple appeals in this case—its failure to explicitly state so was not legal error.

### B. Applicable Legal Standards at Second Step

Having determined that the district court properly reached the second step

of the analysis, we turn to Hasan's argument that "the district court did not follow

the applicable legal standards applicable to the second step." Aplt. Br. at 20. In

*Hasan I* we held:

> If the district court finds that at the time of the grand
> jury proceedings Mr. Hasan's primary language was
> other than English, it must determine whether the lack of
> an interpreter during his testimony inhibited his
> comprehension of the proceedings or communication
> with . . . the presiding judicial officer, [or his]
> comprehension of questions and the presentation of . . .
> testimony, 28 U.S.C. § 1827(d)(1), to such an extent as
> to have made the [hearing] fundamentally unfair . . . .
> This is itself a two-step inquiry.

526 F.3d at 666 (internal quotation and citation omitted).

In making this determination, "[f]irst, the district court must assess whether comprehension or communication was inhibited during his grand jury testimony, or in other words, whether the second prong of the statute is met. If it is met, then it was error for the prosecutor to fail to appoint an interpreter." *Id.* But even if there was error, "the court must then ask whether the error rendered the grand jury proceedings fundamentally unfair." *Id.* "To be sure, the term fundamental fairness (or unfairness) is far from self-defining, but . . . . [i]n the CIA context, courts coming before us have explained that an inquiry into fundamental fairness focuses on whether the purposes of the Act [comprehension of the proceedings and the ability to effectively communicate] were adequately met." *Id.* at 666–67 (internal quotation and citation omitted).

Hasan primarily takes issue with the statement that "[t]his is itself a two-step inquiry," and he argues the district court again failed to explain its reasoning. Hasan argues the district court improperly compressed the analysis in concluding that "the lack of an interpreter during the grand jury did not inhibit Mr. Hasan's comprehension of the grand jury proceedings and communications therein or his comprehension of the questions and presentation of the testimony to such an extent as to have made the grand jury proceedings fundamentally unfair." R., Vol. I at 390.

The government responds that the district court "examined the grand jury transcripts closely, and found indicia that Hasan was able to comprehend and

-15-

communicate during the grand jury proceedings." Aple. Br. at 29. Specifically, the district court found that "Hasan appropriately answered questions, asked for clarification if he did not understand a question, and after receiving clarification responded appropriately and intelligently." R., Vol. I at 382. Additionally, the court reporter testified that she had no trouble understanding Hasan and described his ability to speak English as "fair." *Id.* at 384.

Both parties also argue a related order of battle question: whether the fact that the district court moved on to conclude that the lack of an interpreter did not render the grand jury proceedings fundamentally unfair means the court "made the predicate finding . . . that comprehension or communication was inhibited." Aplt. Br. at 22. Hasan's argument is based on *Hasan I*, which required that the court "first" assess Hasan's comprehension and "then" determine whether the proceedings were fundamentally unfair. 526 F.3d at 666–67. The government counters that *Hasan I* indicated "an inquiry into fundamental fairness focuses on whether the purposes of the Act [comprehension of the proceedings and the ability to effectively communicate] were adequately met." *Id.* at 667.

We find the district court's combined analysis satisfies our directions in *Hasan I* and *Hasan II*. All of the required analysis is in the court's order—though not necessarily in a neat package on appeal. In *Hasan II*, we effectively collapsed the analytical directive into one step, by directing the district court to "determine whether . . . Mr. Hasan was inhibited in his ability to comprehend and

-16-

communicate at the grand jury proceedings to such an extent as to have been fundamentally unfair." 609 F.3d at 1131. While the *Hasan II* opinion does rely on *Hasan I*, the district court's failure to carefully delineate each step along the way was not error.

In sum, the district court understood it must find whether Hasan's "comprehension or communication was inhibited during his grand jury testimony," and then if it was, assess whether any linguistic limitation rendered the proceedings fundamentally unfair. We find that the district court's order adequately addressed both of these required findings.

### C. Merits

Finally, we must consider the underlying merits and the district court's conclusions that the proceedings were fundamentally fair.

We have previously held that the CIA's "protections are liberally applied: 'Any indication to the presiding judicial officer that a criminal defendant speaks only or primarily a language other than the English language should trigger the application'" of the CIA. *United States v. Osuna*, 189 F.3d 1289, 1291 (10th Cir. 1999) (quoting *United States v. Tapia*, 631 F.2d 1207, 1209 (5th Cir. 1980)). We addressed this standard in *Hasan I*, finding that the "record contains a welter of conflicting evidence on both statutory steps," 526 F.3d at 663, and thus directed the district court to "issue factual findings that resolve such tensions," because "only the district court can, in the first instance, make the factual findings on the

-17-

CIA's two statutory steps that are essential to resolving the discrepancies currently apparent in th[e] record." *Id.* at 664.

Hasan argues that the district court, even after two remands, has failed to comply with this directive. Hasan believes that the district court focused too much on his testimony at trial, rather than the transcripts of his testimony to the grand jury, which is particularly important since Hasan had an interpreter at trial, but not during the grand jury proceedings. The government responds that "[a]t its core, Hasan's complaint appears to be that the district court insufficiently explained its reasons for finding that he was 'clearly capable of communicating in English at the time of the grand jury proceedings.'" Aple. Br. at 34. The government acknowledges that the district court did not reconcile or list every piece of evidence it considered in reaching its conclusion, but argues that the court's factual findings were not clearly erroneous.

We disagree with Hasan, but for slightly different reasons than those articulated by the government. We do not doubt that complying with the most recent remand order was a difficult task—determining, after the fact, comparative language ability was going to be a challenge regardless of the record before the court. Even so, in other contexts we have found that trial courts can make such a determination, such as in competency proceedings, where courts often must make after-the-fact determinations based on "the defendant's behavior and demeanor at trial, together with any prior medical opinions" on the subject. *Valdez v. Ward*,

219 F.3d 1222, 1240 (10th Cir. 2000). And other circuits have held that "[t]he district court is afforded wide discretion in implementing the Court Interpreters Act because it is in the best position to evaluate the need for and the performance of interpreters." *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir. 2003).

Here, the district court did not observe the grand jury proceedings, and the transcripts do not provide a glimpse into attitudes, expressions, pauses, or other cues that can be assessed during live testimony. But the district court had other clues that assisted its assessment. At trial, which was several months after the end of the grand jury proceedings, it was able to rely on its impression of witnesses presented at trial, and was careful to note that "the majority of the testimony at trial entailed witnesses who had communicated in English with the Defendant shortly before the first grand jury proceedings or within a couple of months after the second grand jury proceedings." R., Vol. I at 382–83.

The district court recounted the testimony of the trial witnesses and the evidence, attempting to discern Hasan's relative English comprehension. The testimony of the court reporter from the grand jury proceedings was particularly useful. She rated Hasan's ability to speak English as "fair," but noted that "his sentence structure was not necessarily correct." *Id.* at 384. She testified that she had taken many depositions of other people that spoke the same way as Hasan, and she felt like he spoke better English on his second appearance before the grand jury than his first appearance. *Id.* at 385. The court also noted Hasan had

obtained a commercial driver's license after passing a test written in English, found employment as a bus driver for the Tulsa Public Schools, and married an American woman who spoke no Somali, whom he corresponded with in English over the Internet. In addition, Hasan completed five semesters of English as a Second Language courses, in which he did well. Law enforcement agents who interviewed Hasan prior to the grand jury proceedings testified he spoke English and was understandable.

The district court also evaluated the grand jury transcripts, finding that its "review of the grand jury transcripts reveal[s] that Hasan was able to communicate in English. . . . [He] appropriately answered questions, asked for clarification if he did not understand a question, and after receiving clarification responded appropriately and intelligently." *Id.* at 382. And in both of its pre-trial orders, the district court discussed its evaluation of the back-and-forth of the grand jury proceedings relating to the need for an interpreter under the CIA.

Hasan also contends the district court's determinations conflict with its decision to provide an interpreter at trial, but then concluding one was not necessary at the grand jury proceedings. The district court explained:

> The sole reason for appointing an interpreter for purposes of trial was the fact that witnesses might talk more rapidly, attorneys might speak over witnesses and/or make objections, and the Defendant might not have an opportunity to stop the proceedings and ask questions or clarify matters or to understand the legal nuances. Whereas, in the grand jury setting, the

> Defendant only had to concentrate on the specific questions being asked of him and he was able to ask for clarification before he answered any question.

*Id.* at 390 n.15. The court further observed that it was Hasan's attorney at trial who requested that an interpreter be provided, and the court did not make findings pursuant to the CIA. It is also worth noting that one of defense counsel's theories at trial was Hasan's inability to communicate in English caused his inconsistent responses to the grand jury. *See, e.g.*, R., Vol. IV at 18. In any event, at the time of the grand jury proceedings, Hasan voluntarily chose to waive his right to be represented by counsel—causing the district court to conclude that "[i]t is not possible, at this time, to say if an attorney had been requested . . . whether that attorney would have requested that the government provide the Defendant with an interpreter during those proceedings." R., Vol. I at 389 n.14. While we obviously recognize a grand jury proceeding is largely adversarial to the target, what is important in this case is that the transcript of the proceedings show Hasan was given the opportunity to request clarification when he needed it and took advantage of that opportunity numerous times throughout the grand jury examination.

Finally, with respect to the testimony recounted in Appendix A of *Hasan I*, Hasan argues that the district court failed to specifically address the examples which show "some degree of confusion and trouble with the English language." 526 F.3d at 663. In Appendix A, we listed a number of instances where Hasan

exhibited confusion during his two appearances before the grand jury. *Id*. at 667–74. But, as explained above, the district court adequately dealt with this confusion in its order, even though the court has never specifically evaluated each line of testimony. Instead, the court concluded that its review of the entirety of the grand jury transcripts found that Hasan asked for clarification if he did not understand a question, and after receiving clarification, provided a satisfactory and intelligent answer. Our review of Appendix A confirms that Hasan exhibited confusion over some of the questions, but he asked clarifying questions, often multiple times, until he understood the question posed and could properly answer. While, again, the district court's order could have gone further in analyzing the record, given its overall familiarity with the grand jury record and other proceedings, we cannot find that the court's factual findings were clearly erroneous or its conclusions amounted to legal error.

Based on its conclusion that Hasan could comprehend the questioning at the grand jury hearing and communicate adequately, the district court did not err in finding the grand jury proceedings fundamentally fair.

## III. Conclusion

Based on the foregoing analysis, we AFFIRM Hasan's conviction.